UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PHARMERICA, INC.,

        Plaintiff,

v.

SCOTT ARLEDGE,

        Defendant.
_____/

Case No. 8:07-cv-486-T-26MAP

# ORDER

This cause comes before the Court on Plaintiff, PharMerica, Inc.'s, Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction and Supporting Memorandum of Law (the "Motion" and "Memorandum"). After careful consideration of the Motion and Memorandum, the Court GRANTS Plaintiff's Motion.

## I. BACKGROUND

**A.  Arledge's Knowledge of Confidential and Proprietary Information and Trade Secrets Belonging to PharMerica**

Arledge was at the top level of PharMerica's management team and, in that capacity, had access to extremely sensitive and proprietary information and documents that were restricted to management at the executive vice president level. In this regard, Arledge had authorization to access and use information concerning all of PharMerica's confidential projects and plans. Arledge was also instrumental in developing and implementing many of PharMerica's most important and sensitive trade secrets. These trade secrets can be grouped into several categories, which include (a) PharMerica's development of a major plan to transform its operations by

centralizing distribution and moving to a paper-less communication system with its nursing home customers; (b) PharMerica's development and implementation of a specialized Quality Management Program, and (c) PharMerica's pricing, especially those for major corporate clients, who represent at least one-third of PharMerica's total revenues.

PharMerica's trade secrets give it a distinct advantage over its competitors. There are no commercially available programs or systems tailored to fit the highly regulated long term care industry so if PharMerica's competitors wish to design and implement such programs or systems, they must do what PharMerica did – invest hundreds of thousands of dollars and thousands of hours of employee time.

1. **PharMerica's Centralized Distribution and Paper-less Communication System**

Arledge has detailed knowledge of a major project PharMerica began in late 2005 to modernize, streamline, and centralize its distribution and move to a paper-less communication system with its nursing home customers. At that time, PharMerica realized that its distribution system needed to be updated to shift to a more centralized system and that its communications system should become more computerized. As a result, PharMerica began studying the methods by which it could modernize its distribution system from one where each of its distribution centers operated much like a neighborhood pharmacy, with primarily manual entry of information and packaging of drugs, to a more efficient computerized and centralized system. At the same time, PharMerica began studying how to computerize its communications with customers to replace a system that relied primarily on paper and faxes.

2

<u>The "Hub and Spoke" Distribution System and the Mercer Report</u>

PharMerica dedicated hundreds of hours of management time and hired an outside consultant, Mercer, to assist PharMerica in determining methods and procedures that would enable it to shift to a more centralized hub and spoke distribution system and a paper-less electronic communication system. In addition to the hundreds of hours of time invested by PharMerica employees in this effort, PharMerica paid Mercer over $275,000. Mercer delivered an extensive report to PharMerica, detailing its findings and recommendations (the "Mercer Report").

In addition to the Mercer Report, numerous other documents were prepared by the PharMerica team working on this project. These documents included detailed models, pro formas, and similar documents that addressed issues of importance in PharMerica's industry. Because of the highly regulated nature of the pharmaceutical industry (including packaging and disbursement of prescription medication), the details of such a system are crucial to its success, and include an analysis of operational and financial metrics and compliance with regulatory standards for the packaging and distribution of pharmaceuticals.

As a result, information concerning PharMerica's hub and spoke distribution system (including the Mercer Report) and the transition to a paper-less communication system, have been closely guarded secrets at PharMerica. Only a few members of the PharMerica team working on this project had knowledge about the entire project. This was done in an effort to further protect the confidentiality of this information. Furthermore, a "Clean Team" designation was placed on the Mercer Report when PharMerica was in merger negotiations with Kindred Pharmacy Services, which is one of PharMerica's competitors. This was done to insure that confidential and proprietary information that flowed back and forth between the companies in

merger discussions would not be used to competitive advantage in the event a merger did not occur. PharMerica's Electronic Paper-less Transmittal System

The other aspect of this project – PharMerica's transformation to an electronic paper-less communication system – is underway. While Arledge was with PharMerica, it acquired Vector, Inc., a company that owned patent-pending technology which permitted the transition to a paper-less system. Since that acquisition, PharMerica has moved forward with its planned roll-out of a paper-less system. Arledge and his operations staff were intimately involved in the implementation of this program, which involved technical, regulatory, and operational issues, all of which had to be analyzed and addressed in detail. PharMerica's investment in this system and its roll-out thus far exceeds $15 million.

2.   **PharMerica's Quality Management Program**

In addition to Arledge's high-level participation in the analysis and development of the hub and spoke distribution system and the paper-less communication system, Arledge was a primary participant in the development and implementation of PharMerica's Quality Management Program. PharMerica differentiates itself from its competitors by focusing on quality assurance and customer satisfaction. Because there is no commercially available customized quality assurance program customized for the long term care pharmacy industry, PharMerica was required to create its own customized program, which it began in early 2004. At that time, PharMerica engaged the firm of Philip Crosby and Associates, an expert in the quality assurance field, to assist PharMerica in developing a formal Quality Management Program, incorporating education, training, establishment of best practices, policies and procedures, and metrics for measuring success.

PharMerica invested thousands of hours of employee time and well over $175,000 in consulting fees and other hard costs to develop its Quality Management Program. Although Quality Management Program materials are made available to PharMerica employees in branches around the country, those employees are all required to sign non-disclosure agreements which are intended to cover these and other PharMerica materials.

### 3. PharMerica's Pricing Matrix

As the Senior Vice-President of Operations at PharMerica, Arledge was also instrumental in the development and use of PharMerica's pricing analyses, schedules, and information. This information is crucial to PharMerica's business because the vast majority of its major clients award contracts based on pricing. PharMerica keeps it pricing confidential and only those employees involved in pricing are given access to price information. In addition, PharMerica's contracts with its customers include an express provision requiring the customer to maintain the secrecy of PharMerica's pricing.

**B.   Arledge's Resignation and Systematic Copying and Deletion of Confidential, Proprietary, and Trade Secret Information Belonging to PharMerica**

On March 9, 2007, Arledge resigned from his employment with PharMerica to become a Vice-President at Omnicare, Inc. ("Omnicare"), PharMerica's primary competitor. At that time, Arledge stated that he was going to work on Omnicare's hub and spoke distribution plan and on Omnicare's quality control processes to make Omnicare more "friendly" to its customers. (Declaration of Janice Rutkowski). Arledge also told PharMerica that Omnicare had offered him a two year contract and had agreed to indemnify him from any claims made by PharMerica. (Declaration of Janice Rutkowski)

Shortly thereafter, PharMerica began examining its computers, including the laptop computer that Arledge used in his Tampa office. Stephen J. Myers, Director of Windows and Communications Services at PharMerica, was directed to review of Arledge's laptop computer. While reviewing the laptop, he determined that there were several thousand e-mails on the laptop but that the hard drive"C" drive was virtually empty. (Declaration of Stephen J. Myers). PharMerica also employed a forensic computer expert, Adam Sharp at E-Hounds, to examine the PharMerica computer that Arledge had been using at his Tampa office.

As a result of these efforts, on March 14, 2007, PharMerica learned that:

(a)    On February 13, 2007, Arledge downloaded a copy of the Mercer Report, which was marked "CLEAN" (regarding PharMerica's hub and spoke system), to an external personal AOL account (SA1961@aol.com) at 8:25 a.m. (Declaration of Stephen J. Myers). Later that day, Arledge met with Pat Keefe, the Executive Vice-President of Omnicare, and Joel Gemunder, the President of Omnicare, at Omnicare's headquarters in Covington, Kentucky. Arledge apparently download the Mercer Report in preparation for his meeting at Omnicare. In an email fragment retrieved from Arledge's laptop computer, Arledge wrote to Mr. Keefe on February 14, 2007, about the February 13 meeting:

> Just wanted to drop you a quick note to say thanks for spending time with me yesterday. I really appreciate the professional and friendly nature of the conversation. It certainly seems we have a similar philosophy and approach to the LTC Pharmacy business. I enjoyed meeting with Joel as well. I appreciate him making time to talk. Please pass along my appreciation as I do not have his email address.
>
> Pat, I am very interested in continuing our discussions. It certainly seems like a great opportunity. Do not hesitate to call me on my cell at any time, including over the weekend if you would like to talk.
>
> I hope you have a good rest of the week and a good board meeting.

(Declarations of Adam Sharp, Exhibit 2).

(b)     On March 7, 2007, two days prior to his resignation, Arledge copied almost all of his electronic files from his work computer and then permanently deleted many, if not most, of those files. Specifically, Arledge downloaded files containing PharMerica's confidential proprietary information and trade secrets likely using a "Store'N'Go" USB drive, then permanently deleted more than 475 of these files from the computer. The "Store'N'Go" device is marketed as a device that permits the user to access and download information from a computer without a trace. (Declarations of Adam Sharp).

PharMerica has analyzed the files that Arledge downloaded and has determined that they contain PharMerica's Confidential Information and trade secrets including, but not limited to, files concerning (a) PharMerica's hub and spoke distribution model and its paper-less electronic communication system with customers; (b) merger and account management information; (c) PharMerica's corporate pricing; (d) PharMerica's development and implementation of a specialized Quality Management Program, and (e) the Market Analytics Group ("MAG") study enlisted by PharMerica at considerable expense and effort in order to improve its operating efficiencies and bottom line. (Declaration of Janice Rutkowski).

Arledge never informed PharMerica that on February 13, 2007 and March 7, 2007, he purposefully downloaded files containing PharMerica's confidential proprietary information and trade secrets to his personal AOL account or to a "Store'N'Go" device. Similarly, Arledge never informed PharMerica that he permanently deleted over 475 files from his laptop computer. Arledge has not returned to PharMerica any of its Confidential Information or trade secrets.

PharMerica now seeks injunctive relief enjoining Arledge from using any of the confidential and proprietary information he learned during the course of his employment with

7

PharMerica, and from working for any of PharMerica's competitors for a period of six months. PharMerica also requests that this Court direct Arledge to return any and all of the documents, data, and information that he took from PharMerica.

## II. LEGAL STANDARD

In evaluating whether a motion for temporary injunctive relief should be granted, district courts must evaluate whether the movant establishes "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." Schiavo v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005) (citing Ingram v. Ault, 50 F.3d 898, 900 (11th Cir. 1995)); see also Local Rule 4.05(b)(4). PharMerica succeeds in establishing each of these elements as set forth more fully below.

## III. LEGAL ANALYSIS

**A.    PharMerica's Likelihood of Success on the Merits of Its Claims**

**1.    The Breach of Nondisclosure Agreement Claim**

PharMerica has demonstrated a likelihood of success on its claim that Arledge breached his nondisclosure agreement. This is essentially a breach of contract claim. Under Florida law, the elements of an action for breach of contract are "(1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." Rollins, Inc. v. Butland, 2006 WL 3686484, *12 (Fla. 2d DCA Dec. 15, 2006) (citing Knowles v. C.I.T. Corp., 346 So.2d 1042, 1043 (Fla. 1st DCA 1977)).

PharMerica has alleged facts that satisfy all the elements of such a claim. To wit, PharMerica has demonstrated the existence of a contract by virtue of the nondisclosure and non-

solicitation agreement. The agreement explicitly required Arledge to return all of the confidential information, including data stored on his computer that he acquired during the course of his employment at PharMerica. The agreement also prohibits Arledge from copying, summarizing, or disclosing to any person not employed by PharMerica any confidential information. Rather than return the materials, Arledge copied and kept them for his own use in clear breach of the agreement. Specifically, on February 13, 2007, Arledge downloaded a copy of the Mercer Report to his AOL account and then met with at least two senior executives from Omnicare that very same day. Moreover, within only a few short days prior to his resignation, Arledge surreptitiously copied numerous electronic files from his work computer containing PharMerica's confidential proprietary and trade secret information and downloaded files containing PharMerica's confidential proprietary and trade secret information likely to a "Store'N'Go" USB drive. He then deleted many of these files from his work computer, all in breach of the nondisclosure and non-solicitation agreement.

PharMerica has also demonstrated that it has been damaged by Arledge's breach of the agreement. In fact, the agreement explicitly states that any breach of the agreement by Arledge constitutes harm to PharMerica. Arledge resigned from his employment with PharMerica to become vice-president at PharMerica's primary competitor, Omnicare. Arledge's very presence at Omnicare puts at risk and seriously jeopardizes the hundreds of thousands of dollars and hundreds of hours of manpower that PharMerica has invested in the development of its market strategy.

Accordingly, PharMerica has shown a likelihood of success on its breach of nondisclosure and non-solicitation agreement claim against Arledge.

2.  **The Misappropriation of Trade Secrets Claim**

Additionally, PharMerica has demonstrated a likelihood of success on its claim that Arledge misappropriated trade secrets. Under Florida law, "trade secret" means:

> information, including a formula, pattern, compilation, program, device, method, technique, or process that: (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).

PharMerica has demonstrated both that it derives value from the information that it considers to constitute protected trade secrets, and that it has taken reasonable efforts to ensure the secrecy of that information. For example, PharMerica's development of a major plan to transform its operations by centralizing distribution and moving to a paper-less communication system with its nursing home customers resulted in the creation of several confidential documents. One of the most important documents, the Mercer Report, was the result of hundreds of hours of manpower and an expense of more than $275,000 to PharMerica. PharMerica designated the Mercer Report as a "Clean Team" file in order to ensure that it was guarded with the utmost secrecy as PharMerica conducted merger negotiations with a competitor, Kindred Pharmacy Services. PharMerica likewise took steps to protect the confidentiality of its Quality Management Program and pricing information, both of which are critical to PharMerica's commercial success. PharMerica took further efforts to protect confidentiality of its information by having Arledge and others like him sign the Agreement Not to Disclose or Solicit, which Arledge signed on December 16, 2004, and by restricting access to this information.

Accordingly, information pertaining to (a) the development of PharMerica's "hub and spoke" distribution system and paper-less communication system with its nursing home customers, (b) the development and implementation of PharMerica's specialized Quality Management Program, and (c) pricing, especially for PharMerica's major corporate clients, constitutes trade secrets as defined in § 688.002 of the Florida Statutes.

Arledge misappropriated those trade secrets by duplicating and copying them and/or sending them to his home computer or personal email account and deleting them from the PharMerica computers. Arledge further misappropriated PharMerica's trade secrets by breaching his duty return the documents. Hence, PharMerica has demonstrated that it would likely win a misappropriation of trade secrets claim against Arledge.

### 3. The Computer Fraud and Abuse Act Claim

PharMerica likewise has demonstrated a likelihood of success on its claim brought under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030 et seq. Section 1030(g) of the CFAA allows "[a]ny person who suffers damage or loss by reason of a violation of this section [to] maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1320(g). PharMerica's allegations essentially come within the purview of two sections of the Act—18 U.S.C. §§ 1030(a)(4) and 1030(a)(5).

In order to prove a claim under § 1030(a)(4), a party must satisfy four elements: that the defendant (1) has accessed a "protected computer" (2) without authorization or by exceeding such authorization as was granted, (3) "knowingly" and with "intent to defraud," and (4) as a result has "further[ed] the intended fraud and obtain[ed] anything of value." P.C. Yonkers, Inc. v Celebrations the Party & Seasonal Superstore, LLC, 428 F.3d 504, 508 (3d Cir. 2005); ViChip

11

Corp. v. Lee, 438 F. Supp. 2d 1087, 1100 (N.D. Cal. 2006); see also Pacific Aerospace & Elecs., Inc. v Taylor, 295 F. Supp. 2d 1188, 1195 (E.D. Wash. 2003).

As set forth in more detail above, on March 7-9, 2007, Arledge intentionally accessed the PharMerica laptop computer assigned to him and, using that laptop computer for his own improper and illegal purposes (and thus, without authorization from PharMerica), downloaded a large body of data (including PharMerica's confidential proprietary information and trade secrets) for his personal use so that he could use that information after leaving PharMerica's employment (and in competition with PharMerica). After copying such data to his USB device, Arledge then permanently deleted, without authorization, over 475 files. Arledge also permanently deleted, without authorization, emails and other files to "cover his tracks" and deprive PharMerica of the benefit of the information contained in those files.

Approximately one month earlier, on February 13, 2007, Arledge downloaded the highly confidential Mercer Report and other materials concerning PharMerica's hub and spoke distribution project to his personal AOL account. Later that same day, Arledge met with officers of Omnicare to discuss his employment at Omnicare. From that time until March 9, 2007, Arledge accessed PharMerica computers and permanently deleted files that he was not authorized to permanently delete. Arledge's actions damaged PharMerica in that they destroyed information and electronic data belonging to PharMerica, impaired PharMerica's access to its data, and caused PharMerica to incur substantial expenses to attempt to recover its information and electronic data. All of these actions tend to show a likelihood of success on PharMerica's claim brought under § 1030(a)(4).

PharMerica's CFAA claim also includes a claim under § 1030(a)(5) for Arledge's permanent deletion of files from his laptop computer without authorization. That section

imposes criminal liability on whomever:

> (5)(A)(i) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;
> (ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or
> (iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage; and
> (B) by conduct described in clause (i), (ii), or (iii) of subparagraph (A), caused (or, in the case of an attempted offense, would, if completed, have caused)--
> (i) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value. . . .

18 U.S.C. § 1030(a)(5).

Arledge's actions have likely caused damage to PharMerica's electronic information and computer systems in a loss exceeding $5,000. Such loss would include, but would not be limited to, expenses incurred to (a) examine the laptop computer that had been assigned to Arledge, (b) determine what files had been copied and deleted, and (c) attempt to restore information and electronic data Arledge destroyed or deleted.

For these reasons, not unlike similar cases where employers have pursued civil remedies under the CFAA against employers who "seek a competitive edge through wrongful use of information from the former employer's computer system," P.C. Yonkers, Inc., 428 F.3d at 510 (quoting Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1124 & n. 3 (W.D. Wash. 2000)), PharMerica would likely succeed in winning on the merits of this claim. See also Int'l Airport Ctrs., LLC v. Citrin, 440 F.3d 418 (7th Cir. 2006).

B.  **Whether PharMerica Has Shown that It Will Suffer Irreparable Injury if the Relief Is Not Granted**

PharMerica has demonstrated that it will suffer irreparable harm if a temporary restraining order against Arledge does not issue. Again, Arledge assented to a non-disclosure and non-solicitation agreement that included a provision stating that irreparable harm would result to PharMerica if Arledge failed to honor his promise in the agreement, monetary damages would not be an adequate remedy for PharMerica, and PharMerica would be entitled to an injunction as a matter of right and law. (Nondisclosure and Non-Solicitation Agreement). Independent of the agreement, the fact remains that if Arledge disclosed any of the confidential information or trade secrets he misappropriated to Omnicare, PharMerica will suffer damage that cannot be reversed or repaired. Courts have recognized the need for immediate injunctive relief when employers are threatened by conduct of former employees that would "irreversibly alter the status quo." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048, 1054 (4th Cir.1985). In Bradley, the court awarded an injunction to an employer after a former employee breached a non-solicitation agreement by soliciting customers belonging to the employer. The court recognized that the breach of such an agreement required immediate action in order to have any effect and that "[a]n injunction even a few days after solicitation has begun is unsatisfactory because the damage is done. The customers cannot be 'unsolicited.'" Id. Similarly, PharMerica would not be able to "undisclose" any of the misappropriated trade secrets that Arledge passes on to Omnicare. Once Omnicare learns PharMerica's trade secrets, the status quo between the competitors as to that particular information is lost forever. As such, PharMerica has demonstrated an irreparable injury.

C.    **Balance of the Harms**

PharMerica argues that its actual harm outweighs any threat of injury to Arledge by the issuance of this injunction. This Court agrees. The Agreement Not to Disclose alone demonstrates an understanding between the parties that irreparable harm would result to PharMerica if Arledge failed to act has he promised to do under the agreement. As PharMerica correctly points out in its motion, "Arledge simply has no right to keep PharMerica's information or to use it for Omnicare's benefit in competition against PharMerica, particularly given that the information was developed at great expense and effort by PharMerica." (Motion at 17). By contrast, PharMerica has a statutorily protected right to preserve its most confidential and proprietary information in a manner that shields PharMerica from damage that could be caused by someone acquiring or disclosing the information through improper means. See Fla. Stat. § 688.002. In addition, Arledge gave PharMerica thirty days' notice on March 9, 2007. By Arledge's own admission, he likely has not begun working for Omnicare and will not do so until sometime in April 2007. Thus, the immediate harm to PharMerica is greater than any threatened injury to Arledge.

D.    **The Public Interest**

PharMerica asserts that the public interest will be served by protecting the trade secrets and confidential and proprietary information of businesses such as PharMerica who invest a great deal of resources in developing intellectual property to serve its customers. The court agrees with this proposition as well. The public has an interest in protecting business from theft of confidential information. Remedies at law are often insufficient "because of the time-sensitive nature" of confidential information and trade secrets "and the possible advantage it could engender." Hatfield v. Autonation, Inc., 939 So. 2d 155, 158 (Fla. 4th DCA 2006). Here,

15

an injunction against Arledge is appropriate not only because it would help protect PharMerica from the harm that a competitor could inflict by gaining an unfair advantage, but also because it protects the "advancement of honest business enterprises and the economic well-being of the nation as a whole." (Motion at 18).

## IV. FINDINGS OF FACT

PharMerica has presented facts sufficient to warrant the entry of a temporary restraining order. Based on the foregoing, the Court makes the following findings:

1. Arledge breached his non-disclosure and non-solicitation agreement with PharMerica.

2. Arledge's breach of his non-disclosure and non-solicitation agreement with PharMerica has caused PharMerica to suffer an irreparable harm.

3. PharMerica's development of a major plan to transform its operations by implementing "hub and spoke" distribution, including the Mercer Report, is a trade secret.

4. PharMerica's plan to move to a paper-less communication system with its nursing home customers, including the Vector system, is a trade secret.

5. PharMerica's development and implementation of a specialized Quality Management Program is a trade secret.

6. PharMerica's pricing analyses, schedules, and information constitutes trade secrets.

7. Arledge misappropriated trade secrets from PharMerica.

8. Arledge's misappropriation and disclosure or threatened disclosure of the aforementioned trade secrets to Omnicare has caused PharMerica to suffer an irreparable harm

## V. CONCLUSION

Based on the foregoing, it is **ORDERED** that:

1. Plaintiff, PharMerica, Inc.'s, Motion for Temporary Restraining Order is **GRANTED**.

2. Defendant, Scott Arledge, is hereby ordered and directed to:

    a. Immediately return to PharMerica any and all documents, data, and information Arledge has taken from PharMerica and enjoining any use or disclosure of PharMerica's Confidential Information;

    b. Immediately cease use or deletion of any materials from the computer to which he sent or uploaded PharMerica documents and any and all other computers, equipment, USB storage devices, hard drives, PDA's, or any similar device on which data may be stored, in his custody, possession or control ("the Computer Equipment").

    c. Within two days of his receipt of the Order, deliver the Computer Equipment to PharMerica's computer expert, Adam Sharp, E-Hounds, Inc., 2045 Lawson Road, Clearwater, Florida 33763, so that PharMerica's expert can examine and copy the information on the computer Equipment.

    d. Within ten days of his receipt of the Order, appear in Tampa for deposition (not to exceed 8 hours) by PharMerica.

    e. Immediately postpone beginning his new employment with Omnicare until at least 10 days after all of the above requirements are met and the deposition is concluded, thereby allowing PharMerica time to seek additional relief if

necessary, including but not limited to an injunction further postponing Arledge's employment with Omnicare.

3. Defendant shall file a response to Plaintiff's request for preliminary injunctive relief on or before **12:00 noon** on **Thursday, March 29, 2007.**

4. This Temporary Restraining Order shall remain in effect until **1:30 p.m.**, on **March 30, 2007**, at which time a hearing on Plaintiff's Motion for Preliminary Injunction shall be conducted before this Court in Courtroom 15B, Sam M. Gibbons U.S. Courthouse, 801 North Florida Avenue, Tampa, Florida 33602. Defendant may present evidence and show cause as to why a preliminary injunction should not issue against him at that time.

**DONE** and **ORDERED** in Tampa, Florida on this 21st day of March, 2007, at 1:15 p.m.

                                              *s/ Richard A. Lazzara*
                                              **RICHARD A. LAZZARA**
                                              **UNITED STATES DISTRICT JUDGE**

<u>Copies furnished to:</u>
Counsel of Record
Unrepresented parties